# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HEALTH ALLIANCE HOSPITALS, INC.,<br>     Plaintiff<br><br>     v.<br><br>SYLVIA M. BURWELL, Secretary of the<br>U.S. Department of Health and Human<br>Services,<br>     Defendant | Civil Action No. 13-1775 (CKK)<br>Civil Action No. 14-159 (CKK) |

## MEMORANDUM OPINION
(September 16, 2015)

Plaintiff Health Alliance Hospitals, Inc. ("Plaintiff" or "the Hospital") filed two lawsuits pursuant to the Administrative Procedures Act ("APA") challenging the Secretary of the Department of Health and Human Services' reduction of the Medicare payments to the Hospital under the Disproportionate Share Hospital ("DSH") program in cost years 2003 (Case No. 14-cv-159), and 2004 and 2006 (Case No. 13-cv-1775). The amount of payments available to urban hospitals under the DSH program depends, in part, on the number of beds the hospital has available for inpatient care. Plaintiff alleges that the Secretary's deduction of beds licensed for inpatient care, but used for observation services, from Plaintiff's bed count in each of the three cost years was arbitrary, capricious, and otherwise contrary to law. Presently before the Court are Plaintiff's Motion for Summary Judgment and Defendant's Cross-Motion for Summary Judgment. Upon consideration of the pleadings,[1] the relevant legal authorities, and the record as

---

[1] The Court considered the following pleadings in 13-cv-1775 and 14-cv-159 in evaluating the parties' motions: Plaintiff's Motion for Summary Judgment ("Pl.'s Mot."), ECF No. 19; Defendant's Opposition to Plaintiff's Motion for Summary Judgment and Defendant's Cross-Motion for Summary Judgment ("Def.'s Cross-Mot."), ECF No. 21; Plaintiff's Opposition to Defendant's Cross-Motion for Summary Judgment and Reply in Support of Plaintiff's Motion for Summary Judgment ("Pl.'s Reply"), ECF No. 22; and Defendant's Reply to Plaintiff's Opposition to Defendant's Cross-Motion for Summary Judgment ("Def.'s Reply"), ECF No. 25. In both cases, Plaintiff filed a Motion for Leave to File Sur-Reply, ECF No. 26, which the Court

a whole, the Court finds that the Secretary's deduction of observation bed days from the available bed days listed to determine the amount of DSH payments for which Plaintiff was eligible for cost year 2003 was arbitrary and capricious. However, the Court finds that the same deduction from Plaintiff's 2004 and 2006 cost years based on the Secretary's amended regulation explicitly requiring the deduction of these bed days was neither arbitrary nor capricious. Accordingly, as to cost year 2003, Plaintiff's Motion for Summary Judgment is GRANTED and Defendant's Cross-Motion for Summary Judgment is DENIED (Case No. 14-cv-159). However, as to cost years 2004 and 2006, Plaintiff's Motion for Summary Judgment is DENIED and Defendant's Cross-Motion for Summary Judgment is GRANTED (Case No. 13-cv-1775).

## I.   BACKGROUND

### A.  Statutory and Regulatory Background

Medicare "provides federally funded health insurance for the elderly and disabled," *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1226-27 (D.C. Cir. 1994), through a "complex statutory and regulatory regime," *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 404 (1993). The program is administered by the Secretary of the Department of Health and Human Services through the Centers for Medicare and Medicaid Services ("CMS"). *Cape Cod Hosp. v. Sebelius*, 630 F.3d 203, 205 (D.C. Cir. 2011). "Part A of the Medicare program provides insurance coverage for inpatient hospital care, home health care, and hospice services." *Amgen,*

---

shall grant since Defendant raised new arguments in her Reply to which Plaintiff should be granted the opportunity to respond. The Court shall also grant Defendant's Motion for Leave to File Response to Sur-Reply. *See* ECF No. 29. Accordingly, in preparing this Memorandum Opinion, the Court also considered Plaintiff's Sur-Reply in Opposition to Defendant's Cross-Motion for Summary Judgment ("Pl.'s Sur-Reply"), ECF No. 26-1, and Defendant's Response to Plaintiff's Sur-Reply ("Def.'s Resp."), ECF No. 29-1. Finally, the Court considered the 2003 and 2004-2006 Administrative Records. *See* 2003 Administrative Record, Case No. 14-cv-159, ECF No. 15; 2004-2006 Administrative Record, Case No. 13-cv-1775, ECF No. 17.

*Inc. v. Smith*, 357 F.3d 103, 105 (D.C. Cir. 2004) (citing 42 U.S.C. § 1395c). "Part B of Medicare

is a voluntary program that provides supplemental coverage for other types of care, including

outpatient hospital care." *Id.* (citing 42 U.S.C. §§ 1395j, 1395k). Observation services are

classified as outpatient services and are generally reimbursed under Part B. 59 Fed. Reg. 27,708,

27,930 (May 27, 1994). Observation services involve monitoring, assessment, and treatment of a

patient to determine whether the patient should be admitted as an inpatient or discharged from

the hospital. Medicare Benefits Policy Manual, Ch. 6, § 20.6 (2003 AR at 396-97). For the cost

years at issue in this case, observation services were only compensable under Part A—rather than

Part B—for patients subsequently admitted to the hospital in cases where "the outpatient

observation care that [the patient] receives is related to the admission such that there is an exact

match between the principal diagnosis for both the hospital outpatient claim and the inpatient

stay." 74 Fed. Reg. 43,754, 43,905 (August 27, 2009). Otherwise, observational services were

only compensable under Part B. *See id.*

  In 1983, with the aim of "stem[ming] the program's escalating costs and perceived

inefficiency, Congress fundamentally overhauled the Medicare reimbursement methodology."

*Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1008 (D.C. Cir. 1999) (citing Social Security

Amendments of 1983, Pub. L. No. 98-21, § 601, 97 Stat. 65, 149). In the overhaul of Part A,

Congress established "a prospective payment system under which hospitals would receive a

fixed payment for inpatient services." *Cape Cod Hosp.*, 630 F.3d at 205. Since then, the

Prospective Payment System ("PPS"), as the overhauled regime is known, has reimbursed

qualifying hospitals for inpatient hospital operating costs at prospectively fixed rates rather than

reasonable operating costs or the hospital's actual costs. *Cnty. of Los Angeles*, 192 F.3d at 1008;

42 U.S.C. § 1395ww(d). Congress recognized that the standard payment under the PPS would

not account for the additional costs of treating a disproportionate number of low-income patients

that some hospitals incur. *Cnty. of Los Angeles*, 192 F.3d at 141. Accordingly, Congress

authorized an additional payment to "disproportionate share hospitals" ("DSH") located in urban

areas that "serv[e] a significantly disproportionate number of low-income patients." 42 U.S.C.

§ 1395ww(d)(5)(F)(i)(I). Congress linked a hospital's eligibility for a DSH adjustment to three

factors: (1) the hospital's location, (2) the number of its beds, and (3) its low-income patient

percentage. *Id.* at § 1395ww(d)(5)(F)(v). For the cost years at issue in this action, hospitals in

urban areas were only eligible for a DSH adjustment if they had at least 15% low-income

patients.[2] *Id.* at § 1395ww(d)(5)(F)(v)(I). The DSH payment received by an urban hospital is

capped at a set percentage of the standard prospective payment rate if the hospital has fewer than

100 beds.[3] *Id.* at §§ 1395ww(d)(5)(F)(iv), (xiii), (xiv). If the hospital has 100 beds or more, there

is no cap on the DSH payment. *Id.* The amount of DSH payment is calculated based on the

"disproportionate patient percentage" ("DPP"). *Id.* at § 1395ww(d)(5)(F)(vii), (xiii). The

disproportionate patient percentage "is determined by adding together two fractions." *Allina*

*Health Servs. v. Sebelius*, 746 F.3d 1102, 1105 (D.C. Cir. 2014); *see* 42 U.S.C.

§ 1395ww(d)(5)(F)(vi). "The first fraction, referred to as the Medicare fraction, measures the

percentage of all Medicare patients (regardless of means) who are low income, i.e., entitled to

---

[2] For discharges prior to April 1, 2001, urban hospitals with fewer than 100 beds were only eligible for DSH payments if they had at least 40% low-income patients. *Id.* at § 1395ww(d)(5)(F)(v)(III).

[3] The level of the cap to the disproportionate adjustment percentage differed among the cost years at issue in the cases before the Court. *See* 2004-2006 AR at 17; 42 U.S.C. § 1395ww(d)(5)(F)(xiii)-(xiv) (increasing the disproportionate adjustment percentage cap for discharges after on or April 1, 2004, from 5.25 percent to 12 percent, subject to exceptions not relevant here). However, the levels of those caps are immaterial to the legal issues before the Court.

supplemental security income benefits." *Allina Health Servs.*, 746 F.3d at 1105. "The second

fraction accounts for the number of Medicaid patients—who, by definition, are low income—*not*

entitled to Medicare." *Id.* These calculations are performed using several categories of "patient

days." The Medicare fraction is the number of "patient days" for patients who were "entitled to

benefits under Part A *and* were entitled to supplemental security income benefits" divided by the

number of "patient days for such fiscal year which were made up of patients who (for such days)

were entitled to benefits under Part A." 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I). The Medicaid

fraction is the number of "the number of patient days attributable to patients who (for such days)

were eligible for Medicaid, but 'not entitled to benefits under [Medicare] Part A'" divided by

"the total number of patient days, regardless of whether the patients were enrolled in a federal

medical benefits program." *Allina Health Servs.*, 746 F.3d at 1105 (quoting 42 U.S.C.

§ 1395ww(d)(5)(F)(vi)(II)).

    The statute authorizing additional payments for DSH did not define "beds," so the

Secretary had the responsibility of filling this gap. *See* 42 U.S.C. § 1395ww(d)(5)(F). In 1986,

the Secretary adopted the definition of beds from the regulation governing the bed count for the

PPS adjustment for teaching hospitals that incur indirect medical education costs (the "IME

adjustment"). *See* 51 Fed. Reg. 16,772, 16,788 (May 6, 1986) (codified at 42 C.F.R.

§ 412.106(a)(3) (1986)) (DSH regulation) ("The number of beds in a hospital is determined as

specified in § 412.118(b)).[4] Specifically, the DSH regulation promulgated in 1986 provided that

> the number of beds in a hospital is determined by counting the number of
> available bed days during the cost reporting period, not including beds assigned to
> newborns, custodial care, and excluded distinct part hospital units, and dividing
> that number by the number of days in the cost reporting period.

---

[4] The bed counting regulation for indirect medical education ("IME") expenses, 42 C.F.R.
§ 412.118(b), was later re-designated as 42 C.F.R. § 412.105(b).

*Id*. While the parties disagree as to the proper interpretation of "bed days," the parties agree that the language of the above definition was not changed, in relevant part, until the Secretary promulgated a revised rule that became effective on October 1, 2003. *See* Pl.'s Mot., at 5 n.1; Def.'s Mot. at 9-15.

In 2003, the Secretary amended the definition of available bed days to expressly exclude the time that hospitals use inpatient beds for observation patients. 68 Fed. Reg. 45,346, 45,418-19 (Aug. 1, 2003). The final regulation provided:

> For purposes of this section, the number of beds in a hospital is determined by counting the number of available bed days during the cost reporting period and dividing that number by the number of days in the cost reporting period. *This count of available bed days excludes bed days associated with ... [b]eds otherwise countable under this section used for outpatient observation services,* skilled nursing swing-bed services, or ancillary labor/delivery services.

*Id.* at 45,470 (emphasis added) (codified at 42 C.F.R. 412.105(b)). The Secretary characterized the amendment to the bed count regulation as a clarification of longstanding policy. *See id.* at 45,416.

The Secretary amended the bed count regulation again in 2004. *See* 69 Fed. Reg. 48,916, 49,096-98 (Aug. 11, 2004). The amended rule, effective October 1, 2004, included observation patient time in the available bed days count when the observation patient was subsequently admitted to inpatient care. *Id.* Other observation patient time remained excluded from the count of available bed days. *See id.* Specifically, the final regulation provided:

> For purposes of this section, the number of beds in a hospital is determined by counting the number of available bed days during the cost reporting period and dividing that number by the number of days in the cost reporting period. This count of available bed days excludes bed days associated with ... [b]eds otherwise countable under this section used for outpatient observation services, skilled nursing swing-bed services, or ancillary labor/delivery services. *This exclusion would not apply if a patient treated in an observation bed is ultimately admitted for acute inpatient care, in which case the beds and days would be included in those counts.*

6

*Id.* at 49,245 (codified at 42 C.F.R. § 412.105(b)) (emphasis added).

**B. Factual Background**

Plaintiff, a non-profit disproportionate share hospital in Leominster, Massachusetts, challenges the deduction of days that inpatient beds were used to treat observation patients from the Hospital's total count of inpatient beds for purposes of the DSH adjustment in cost years 2003, 2004, and 2006. 2003 AR at 13; 2004-2006 AR at 20-21. Importantly, cost year 2003 ended on September 30, 2003, the day before the Secretary's 2003 revised rule came into effect. For each of the cost years at issue, it is undisputed that Plaintiff operated in an urban area and had 103 licensed inpatient beds. 2003 AR at 13-14, 40. In Plaintiff's cost reports, Plaintiff calculated and listed the available bed days for purposes of the DSH adjustment by multiplying the 103 licensed inpatient beds by the number of days in the year. *Id.* During the cost years at issue, patients requiring observation care at the Hospital were placed in licensed inpatient care beds to receive observation services. *Id.* at 40. The observation bed days provided in these beds were listed separately in Plaintiff's cost report for cost reporting purposes, but were not deducted from the available bed days on Plaintiff's cost reports. *Id.*

Plaintiff submitted its 2003 cost report to the CMS's fiscal intermediary, which subtracted the number of observation bed days from the available bed days listed to determine the level of DSH payments for which Plaintiff was eligible. *Id.* at 13-14. The intermediary's calculation reduced Plaintiff's qualifying available bed days below 100, thereby reducing Plaintiff's DSH payment. *Id.* The intermediary also subtracted observation bed days from the available bed days for cost years 2004 and 2006 and reduced Plaintiff's DSH payment for these years as well. 2004-2006 AR at 19. On March 8, 2006, Plaintiff appealed the intermediary's 2003 decision to the agency's Provider Reimbursement Review Board (the "Board" or "PRRB"), as provided by 42

U.S.C. § 1395oo. 2003 AR at 28, 30. Plaintiff appealed its provider reimbursement for cost year

2004 on March 19, 2007, 2004-2006 AR at 1,546, and the reimbursement for cost year 2006 on

September 16, 2008, *id.* at 772. The Board conducted a consolidated hearing on the appeals from

all three cost years. 2003 AR at 55. For cost year 2003, the Board held that the intermediary

erred by excluding the observation bed days from the available bed days because "the exclusion

of observation beds is not supported by the clear language of the regulation and [the Provider

Reimbursement Manual]." *Id.* at 35. As to cost years 2004 and 2006, the Board determined that it

lacked the power to decide the validity of the 2003 and 2004 rulemakings and, thus, issued an

order granting expedited judicial review of the 2004 and 2006 appeals. 2004-2006 AR at 15-21.

The Administrator of CMS, reversed the Board's decision as to the 2003 cost year,

finding that "the CMS' guidance on bed counting demonstrate[s] that the long-standing policy

had been to exclude bed days from the count of available bed days when the beds are used to

provide outpatient observation services." 2003 AR at 7; *see id.* at 16. The Administrator added

that, in any event, "there are no facts contained within the record that support the Provider's

claim that such beds could have been made available for inpatient use" and, accordingly, found

that excluding them from the count of available bed days was appropriate. *Id.* at 15. Finally, the

Administrator affirmed the Board's grant of expedited judicial review for cost years 2004 and

2006. 2004-2006 AR at 2-3.

### C. Procedural Background

On November 11, 2013, Plaintiff filed suit in this Court challenging the intermediary's

decisions for cost years 2004 and 2006. *See Health Alliance Hospitals, Inc. v. Burwell*, No. 13-

cv-1775. Subsequently, on February 3, 2014, after receiving the Secretary's decision reversing

the Board as to cost year 2003, Plaintiff filed suit in this Court challenging the Secretary's

exclusion of observation bed days from inpatient beds for cost year 2003. *See Health Alliance Hospitals, Inc. v. Burwell*, No. 14-cv-0159. Plaintiff filed its Motion for Summary Judgment in each case on October 1, 2014. Plaintiff contends that the Secretary's DSH adjustment determinations for all three cost years are arbitrary, capricious, and otherwise contrary to law. Specifically, Plaintiff argues that the Secretary's determination for the 2003 cost year violates the plain language of the bed count regulation that was in place in 2003 and the Secretary's "long-established interpretation of that regulation," thereby effecting a substantive change from the prior rule. Pl.'s Mot., at 1. As to the 2004 and 2006 cost years, Plaintiff argues that the Secretary's policy to exclude observation days pursuant to the 2003 and 2004 amendments to the bed count regulation "defies all logic and reason" and is "inconsistent with the controlling statute." *Id.* at 2. Plaintiff further argues that the 2003 and 2004 rules are invalid because the Secretary never "acknowledged or explained any good reasons for the agency's departure from the bed count regulation and the agency's original policy under that regulation in effect before the 2003 rule change." *Id.*

The Secretary filed its Cross-Motion for Summary Judgment in each case on December 1, 2014. The Secretary argues that her policy of determining DSH bed-size by subtracting observation days "has been firmly in place since 1986." Def.'s Mot., at 1. As for the 2003 and 2004 rules, the Secretary contends that the rules are entirely lawful because the Secretary "engaged in notice-and-comment, considered alternatives, and fully explained her reasoning" and because the Secretary's policy is "reasonable." *Id.* at 1-2.

Plaintiff subsequently filed its Opposition to Defendant's Cross-Motion for Summary Judgment and Reply to Defendant's Opposition to Plaintiff's Motion in each case and Defendant submitted its Reply to Plaintiff's Opposition in each case. Accordingly, Plaintiff's Motions for

Summary Judgment and Defendant's Cross-Motions for Summary Judgment are fully briefed and ripe for the Court's determination. As the parties' summary judgment briefing in both cases is identical and covers the issues raised in both cases, the Court will address both sets of summary judgment motions in one memorandum opinion.

## II.     LEGAL STANDARD

"As a general matter, an agency's interpretation of the statute which that agency administers is entitled to *Chevron* deference." *Fox v. Clinton,* 684 F.3d 67, 75 (D.C. Cir. 2012) (citing *Chevron, U.S.A., Inc. v. Natural Res. Def. Council,* 467 U.S. 837 (1984)). In the first step of the *Chevron* analysis, the Court reviews the statute *de novo* to determine whether Congress has spoken to the precise question at issue or whether the statute is ambiguous. *Chevron*, 467 U.S. at 842–43. If the statute is ambiguous, the Court then must defer to the agency's interpretation of the statute unless it is "manifestly contrary to the statute." *Id.* at 844. Thus, the inquiry for the Court under the second step of *Chevron* is whether the agency's interpretation of Congress' instructions is reasonable. The Court's inquiry under the second step of *Chevron* "overlaps with [the Court's] inquiry under the arbitrary and capricious standard." *Am. Fed'n of Gov't Employees, AFL–CIO, Local 446 v. Nicholson,* 475 F.3d 341, 345–46 (D.C. Cir. 2007). "Whether a statute is unreasonably interpreted is close analytically to the issue whether an agency's actions under a statute are unreasonable." *Gen. Instrument Corp. v. Fed. Commc'ns Comm'n,* 213 F.3d 724, 732 (D.C. Cir. 2000).

In reviewing agency decisions, the court "must give substantial deference to an agency's interpretation of its own regulations." *Thomas Jefferson Univ.*, 512 U.S. at 512. The court's "task is not to decide which among several competing interpretations best serves the regulatory purpose." *Id.* Rather, the agency's interpretation is controlling "unless it is plainly erroneous or

inconsistent with the regulation." *Id.* (citations omitted). This deference is particularly

appropriate in contexts that involve a complex and highly technical regulatory program, such as

Medicare, which requires significant expertise and entails the exercise of judgment grounded in

policy concerns. *Id.*; *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1229 (D.C. Cir.

1994) ("[I]n framing the scope of review, the court takes special note of the tremendous

complexity of the Medicare statute. That complexity adds to the deference which is due to the

Secretary's decision.").

Judicial review of Medicare provider reimbursement disputes is governed by the

Administrative Procedure Act ("APA"). 42 U.S.C. § 1395oo(f)(1). Under Rule 56(a) of the

Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant

shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." However, "when a party seeks review of agency action under the

APA [before a district court], the district judge sits as an appellate tribunal. The 'entire case' on

review is a question of law." *Am. Bioscience, Inc. v. Thompson,* 269 F.3d 1077, 1083 (D.C. Cir.

2001). Accordingly, "the standard set forth in Rule 56[ ] does not apply because of the limited

role of a court in reviewing the administrative record … . Summary judgment is [ ] the

mechanism for deciding whether as a matter of law the agency action is supported by the

administrative record and is otherwise consistent with the APA standard of review." *Southeast*

*Conference v. Vilsack,* 684 F. Supp. 2d 135, 142 (D.D.C. 2010).

The APA "sets forth the full extent of judicial authority to review executive agency action

for procedural correctness." *FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 513 (2009). It

requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are

"(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,"

"(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;" or

"(D) without observance of procedure required by law … ." 5 U.S.C. § 706(2)(A). The arbitrary

and capricious standard "is a 'narrow' standard of review as courts defer to the agency's

expertise." *Ctr. for Food Safety v. Salazar*, 898 F. Supp. 2d 130, 138 (D.D.C. 2012) (quoting

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43

(1983)). An agency is required to "examine the relevant data and articulate a satisfactory

explanation for its action including a rational connection between the facts found and the choice

made." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (internal quotation omitted). The reviewing

court "is not to substitute its judgment for that of the agency." *Id.* Nevertheless, a decision that is

not fully explained may be upheld "if the agency's path may reasonably be discerned." *Bowman*

*Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 286 (1974).

## III.   DISCUSSION

### A.  2003 Cost Year

Congress has not explicitly addressed the question of whether observation beds should be

included in the count of beds for purposes of determining a hospital's DSH adjustment. In the

statute, Congress specified only that, for urban hospitals, "the disproportionate share adjustment

percentage" is calculated according to different formulas for hospitals that have "less than 100

beds" and hospitals that have "100 or more beds." 42 U.S.C. § 1395ww(d)(5)(F)(iv). The 100-

bed threshold is not defined further in the statute. Accordingly, the Court must proceed to the

second step of the *Chevron* analysis. The parties do not dispute that the regulations governing the

2003 cost year—42 C.F.R. §§ 412.106(a)(1)(i), 412.105(b)—that the Secretary promulgated for

determining the number of beds at a hospital for purposes of the DSH adjustment constitute a

permissible construction of the statute. *See Chevron*, 467 U.S. at 844. Under 42 C.F.R.

§ 412.106(a)(1)(i), the number of beds for purposes of the DSH adjustment is to be calculated in

accordance with § 412.105(b), which also governs additional payments to hospitals for the IME

programs. Pursuant to section 412.105(b), the number of beds in a hospital is determined as

follows for cost year 2003:

> For purposes of this section, the number of beds in a hospital is determined by
> counting the number of available bed days during the cost reporting period, not
> including beds or bassinets in the healthy newborn nursery, custodial care beds, or
> beds in excluded distinct part hospital units, and dividing that number by the
> number of days in the cost reporting period.

42 C.F.R. § 412.105(b) (1995). What the parties do dispute is whether the Secretary's

interpretation and application of its regulation for determining Plaintiff's bed count in cost year

2003 was arbitrary, capricious, or otherwise contrary to law.

The Secretary argues that its long-standing policy has been to "exclude both (1) bed days

on which inpatient beds were used for non-inpatient services, and (2) all bed days of non-

inpatient beds." Def.'s Mot., at 12. The Secretary outlines the history of PPS cost reporting

practices and the IME adjustment, which, the Secretary contends, were focused on inpatient costs

and excluding bed days when the beds were used for observation services, and argues that the

DSH bed count regulation incorporated this approach. *Id.* at 3, 8-10. The Secretary further argues

that the 1985 switch to measuring "*available* bed *days*" over a cost reporting period was clearly

intended to capture fluctuations in day-to-day usage and that the time in which an outpatient is in

an inpatient bed must be excluded from the count of bed days because the bed is not available for

inpatient use. *Id.* at 22.

Plaintiff argues that the Secretary's interpretation of the regulation violates the plain

language of the bed count regulation. Pl.'s Mot., at 15. Specifically, Plaintiff argues that under

the traditional canon of construction *ejudsem generis* ("of the same kind"), the list of beds to be

excluded from the calculation of "bed days" restricts the class of excluded beds "to beds that are

'similar in nature' to the types of excluded beds that are identified in the regulation." *Id.* Plaintiff

contends that "[b]eds that are licensed and maintained to provide inpatient services that are paid

under [the PPS]—the type of beds at issue here—'are not of the same class or type' as the beds

that the regulation's text excludes"—notably, beds that, by definition, cannot come within the

PPS. *Id.* at 16. Plaintiff also argues that the Secretary's attempt to equate beds with actual patient

usage is contrary to the language of the regulation and the agency's long-standing interpretation

of the regulation, which both focus on beds or bed days, not patients or patient days, and

emphasizes the location of the bed in a PPS unit as opposed to its actual usage. *Id.* In addition,

Plaintiff argues that the Secretary's interpretation of beds conflicts with the Secretary's intent

when the regulation was first adopted as reflected in the 1988 Provider Reimbursement Manual

("1988 PRM").[5] The 1988 PRM describes qualifying beds as follows:

> A bed is defined for this purpose as an adult or pediatric bed (exclusive of beds
> assigned to newborns which are not in intensive care areas, custodial beds, and
> beds in excluded units) maintained for lodging inpatients, including beds in
> intensive care units, coronary care units, neonatal intensive care units, and other
> special care inpatient hospital units. Beds in the following locations are excluded
> from the definition: hospital-based skilled nursing facilities or in any inpatient
> area(s) of the facility not certified as an acute care hospital, labor rooms, PPS
> excluded units such as psychiatric or rehabilitation units, postanesthesia or
> postoperative recovery rooms, outpatient areas, emergency rooms, ancillary
> departments, nurses' and other staff residences, and other such areas as are
> regularly maintained and utilized for only a portion of the stay of patients or for
> purposes other than inpatient lodging.
>
> To be considered an available bed, a bed must be permanently maintained for
> lodging inpatients. It must be available for use and housed in patient rooms or
> wards (i.e., not in corridors or temporary beds). Thus, beds in a completely or
> partially closed wing of the facility are considered available only if the hospital
> put the beds into use when they are needed. The term "available beds" as used for

---

[5] Section 2405.3(G) of the PRM was issued in 1988 to "incorporate[] into a single section existing policy setting forth the method for counting beds which had previously been expressed in several sections." *Sacred Heart Med. Ctr. v. Blue Cross & Blue Shield Ass'n/Blue Cross of Washington & Alaska*, Adm'r Dec. (Dec. 21, 1988), *reprinted in* Medicare & Medicaid Guide (CCH) ¶¶ 80, 154. The parties do not dispute that terms defined for purposes of the IME adjustment also govern the DSH adjustment.

> the purpose of counting beds is not intended to capture the day-to-day fluctuations in patient rooms and wards being used. Rather, the count is intended to capture changes in the size of a facility as beds are added to or taken out of service.
>
> In the absence of evidence to the contrary, beds available at any time during the cost reporting period are presumed to be available during the entire cost reporting period. The hospital bears the burden of proof to exclude beds from the count.

PRM § 2405.3(G); 2003 AR at 284. Plaintiff argues that the plain language of the PRM does not deduct "the times when a hospital uses available inpatient beds for patient observation or temporarily uses its beds for other purposes, like office space." *Id.* at 18. Plaintiff further notes that the bed count "is not intended to capture the day-to-day fluctuations" in the use of beds in patient rooms and wards. *Id.* at 19. Plaintiff agrees with the Secretary that the DSH bed count is meant to capture inpatient capacity, but argues that the language of the regulation and the Secretary's contemporaneous statements make clear that inpatient capacity and, in particular, the costs associated with maintaining inpatient capacity, are not diminished by temporary use of an inpatient bed for non-inpatient services.

The Court agrees that the Secretary's interpretation of its own regulation in cost year 2003 is inconsistent with the plain meaning of the regulation and the Secretary's definition of "available bed." For the following reasons, the Court finds that the Administrator's decision as it relates to the Hospital's 2003 cost year was arbitrary and capricious.

### i.    The Regulation's Plain Language and the 1988 PRM

The plain language of the regulation states that the number of beds is to be calculated "by counting the number of available bed days during the cost reporting period, *not including beds or bassinets in the healthy newborn nursery, custodial care beds, or beds in excluded distinct part hospital units,* and dividing that number by the number of days in the cost reporting period. 42 C.F.R. § 412.105(b) (emphasis added). As the regulation specifically lists certain types of beds that are to be excluded from contributing to "available bed days" and observation beds are not

15

among them, the plain meaning of the regulation is that observation beds are not excluded from the bed count. Moreover, as Plaintiff notes, the beds at issue here—licensed inpatient beds maintained to provide inpatient services reimbursed under PPS and used occasionally for observation services—are not the same kind of beds as those specifically excluded in the regulation. Unlike the inpatient beds at issue here, the excluded beds are located in areas and units of the hospital that, by definition, cannot come within PPS. Therefore, even if the Court were to accept the Secretary's argument that the list of excluded beds in the regulation is not exhaustive, *see* Def.'s Mot., at 28, pursuant to the canon of statutory construction *ejudsem generis*, the plain language of the regulation still would not exclude the type of beds at issue here because the excluded beds are not of the same kind. As the Sixth Circuit found in *Clark Regional Medical Center v. U.S. Department of Health and Human Services* when confronted with facts substantially similar to those before this Court, "[h]ad the Department intended to exclude all non-PPS reimbursable beds *and services*, it could easily have written the regulation to do so." *Clark Reg'l Med. Center v. U.S. Dep't. of Health and Human Services*, 314 F.3d 241, 247-48 (6th Cir. 2002) (emphasis added).

The Court finds that the Secretary's 1988 PRM confirms this plain reading of the regulation.[6] The PRM states that "[t]o be considered an available bed, a bed must be permanently maintained for lodging inpatients." PRM § 2405.3(G). The parties do not dispute that the 103 beds at issue here were "licensed inpatient beds located in the area of the Hospital in which it provides acute inpatient hospital services that are payable under [PPS]." Pl.'s Mot., at 9. The 1988 PRM also lists beds that are excluded from the bed count. The Secretary points to the

---

[6] The PRM is "the prototypical example of an interpretive rule issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Shalala v. Guernsey Memorial Hosp.,* 514 U.S. 87, 99 (1995).

PRM's list of "additional" excluded beds as evidence that the regulation's exclusions were not intended to be exhaustive, *see* Def.'s Mot., at 28, but the Court finds that this list actually supports the conclusion that observation days in inpatient certified beds are not excluded from the bed count. The PRM explains that excluded beds are those located in "facilities," "areas," "rooms," "units," or "departments" of a hospital that are "regularly maintained and utilized" for only a portion of a patient's stay or do not provide acute inpatient hospital care that is payable under the prospective payment system.[7] PRM § 2405.3(G). Again, the beds at issue here are not explicitly excluded by the language of the PRM nor are they of the same kind as those excluded in the PRM. Importantly, the PRM's list of excluded beds makes clear that the location of a bed and not individual day-to-day bed use governs whether a bed is included or excluded from the bed count. Accordingly, the Court finds that the Secretary's interpretation of the DSH bed count conflicts with the plain meaning of the bed count regulation.

### ii.     Secretary's Contemporaneous Statements

The Secretary's statements made contemporaneously to the promulgation of the IME and DSH regulations defining beds and published in the Federal Register[8] further confirm the

---

[7] "Beds in the following *locations* are excluded from the definition: hospital-based skilled nursing facilities or in any inpatient area(s) of the facility not certified as an acute care hospital, labor rooms, PPS excluded units such as psychiatric or rehabilitation units, post anaesthesia or postoperative recovery rooms, outpatient areas, emergency rooms, ancillary departments, nurses' and other staff residences, and other such areas as are regularly maintained and utilized for only a portion of the stay of patients or for purposes other than inpatient lodging." PRM § 2405.3(G) (emphasis added).

[8] Throughout their briefing, the parties cite to and rely on several excerpts from the Federal Register but fail to indicate in their briefing or in their Joint Appendix of the Administrative Record where or whether these excerpts are in the Administrative Record. Nevertheless, because these excerpts are published in the Federal Register, this Court can take judicial notice of them. *See Koretoff v. Vilsack*, 841 F. Supp. 2d 1, 17 n.21 (D.D.C. 2012) *aff'd*, 707 F.3d 394 (D.C. Cir. 2013) (citing 44 U.S.C. § 1507 ("The contents of the Federal Register shall be judicially noticed")).

regulation's focus on bed location as opposed to individual bed use. In the 1986 preamble to the

DSH regulation defining beds, the Secretary explained:

> We believe that the method for determining bed size for the disproportionate share adjustment should be consistent with the methods used for other Medicare purposes. Therefore, we are using the same method of determination that is currently used in calculating the indirect medical education adjustment, which is based on the *standard bed size definition used by the Medicare program in connection with the prospective payment system* (that is, the bed count excludes beds used for newborns, custodial care, and excluded distinct part units). *This is also essentially consistent with the method of bed size determination that was used in the past to classify hospitals into the cost limit categories before the implementation of the prospective payment system.*

51 Fed. Reg. 31,454, 31,458 (Sept. 3, 1986) (emphasis added). The Secretary cites to this

language as evidence that the DSH definition of beds was meant to exclude observation bed days

in inpatient beds because, the Secretary alleges, the pre-PPS definition of bed with which the

DSH definition is "essentially consistent" was driven by whether a bed was used for inpatient or

outpatient purposes. *See* Def.'s Mot., at 10 (citing 51 Fed. Reg. at 31,458). The Court disagrees

that this language can be read to support the exclusion of observation bed days and instead finds

that it supports the regulation's focus on location and regular use over individual day-to-day bed

usage. First, in the preamble, the Secretary again uses exhaustive language in explaining that the

"standard bed size definition" used by the Medicare program and the basis for the IME

adjustment excludes three types of enumerated beds—none of which are the beds at issue here or

even of the same kind as the beds excluded here. These exclusions, again, do not turn on the day-

to-day use of a bed. Moreover, the preamble states that the DSH bed definition was intended to

be "essentially consistent" with the pre-PPS method of bed size determination and that method

focused on the general use of particular units, locations, and areas. *See* PRM § 2510.5 (Trans.

No. 129, July 1975).

Similarly, the Secretary reiterated in a 1994 rulemaking related to neonatal intensive care units and the IME adjustment that, in the 1985 IME adjustment rule, the agency

> did not change the definition of available beds. Our current position regarding the treatment of these beds is unchanged from the time when the cost limits established under section 1861(v)(1)(A) of the Act were in effect and is consistent with the way we treat beds *in other hospital areas. That is, if the bed days and costs are allowable in the calculation of Medicare's share of inpatient costs, the beds within that unit are included as well.* Our policy to include the costs, days, and beds of neonatal intensive care units has been in place since prior to the prospective payment system and has been the subject of considerable attention.

59 Fed. Reg. 45,330, 45,373-74 (Sept. 1, 1994) (emphasis added). Like the 1986 preamble language, this language again ties the "available beds" definition to the pre-PPS method of bed size determination which the Court already determined was not driven, as the Secretary argued, by inpatient or outpatient usage, but by the general use of particular locations, areas, or units. The Secretary points to this language as evidence that the Secretary's regulation intended "bed size" to be a measure of inpatient-PPS bed use.[9] Def.'s Mot., at 32. But the Court finds instead that the language, like the Secretary's language from 1986, establishes that the association between costs and beds is made on a unit-wide basis and that the definition of "available beds"

---

[9] As part of this argument, the Secretary also points to the following response to a comment published in the Federal Register in 1988:

> [W]e believe that, based on a reading of the language in section 1886(d)(5)(F) of the Act, which implements the disproportionate share provision, *we are in fact required to consider only those inpatient days to which the prospective payment system applies in determining a prospective payment hospital's eligibility for a disproportionate share adjustment.* ... Moreover, this reading of section 1886(d)(5)(F) of the Act produces the most consistent application of the disproportionate share adjustment, since *only data from prospective payment hospitals or from hospital units subject to the prospective payment system are used in determining both the qualifications for and the amount of additional payment to hospitals that are eligible for a disproportionate share adjustment.*

53 Fed. Reg. 38,476, 38,480 (Sept. 30, 1988) (emphasis added). This response, as the Secretary acknowledges, *see* Def.'s Mot., at 12-13, discusses only "inpatient days," and does not reference bed size or bed days or in any way discuss the relationship between patient days and bed days.

does not turn on the day-to-day usage of the beds within the included units. The Secretary's

response to a comment regarding a 1995 rule also relating to newborns confirms this reading:

> Our bed counting policy essentially is determined by our policies for including or
> excluding costs and days from the calculation of Medicare costs on the cost
> report. *These policies have consistently followed the general principle that we do
> not attribute costs or days to individual beds, but rather to units or departments.*

60 Fed. Reg. 45,778, 45,811 (Sept. 1, 1995) (emphasis added). Based on this policy, the

Secretary issued the rule that "individual beds that are occasionally used to treat less healthy

infants [normally included in inpatient costs], but that are located within a regular, healthy baby

nursery [excluded from the IME/DSH bed count], continue to be treated as part of the unit in

which they are located, that is, as part of the healthy baby nursery." *Id.*

In her briefing, the Secretary relies heavily on the preamble to the 1985 rulemaking

relating to the IME regulation defining beds where the Secretary clarified for a commenter that

> "available beds" are generally defined as adult or pediatric beds (exclusive of
> newborn bassinets, beds in excluded units, and custodial beds that are clearly
> identifiable) maintained for lodging inpatients. *Beds used for purposes other than
> inpatient lodging*, beds certified as long-term, and temporary beds are not
> counted.

50 Fed. Reg. 35,646, 35,683 (Sept. 3, 1985) (emphasis added). The Secretary emphasizes the

language, "[b]eds used for purposes other than inpatient lodging," as evidence that the DSH bed

regulation was intended to exclude beds maintained for lodging inpatient beds when they are

used for observation services. Def.'s Mot., at 8. However, the Court agrees with Plaintiff that

"[i]n context, it makes no sense to read this exclusion as the one outlier that requires counting

occasional fluctuations in use, rather than as a reference to beds that are ordinarily and regularly

used for non-inpatient purposes." Pl.'s Reply at 22. The other exclusions within the Secretary's

clarification refer to more permanent non-inpatient uses, notably beds certified as long-term beds

and temporary beds. The Court also finds it notable that when the commenter requested a more

precise definition of the term "available bed days" the Secretary responded by defining "available *beds*," *see* 50 Fed. Reg. at 35,683 (emphasis added), undercutting the Secretary's present attempt to distinguish "beds" from "bed days" and to argue that "available bed days" measures specific bed usage as opposed to general, regular usage.

The Secretary further argues that the inclusion of the term "available" before "bed" necessarily means that the DSH bed regulation was meant to measure daily use in addition to location because an inpatient bed occupied by an observation patient would not be available for other patients to be admitted. Def.'s Mot., at 35; Def.'s Reply, at 6. However, the Secretary's own explanation of "available" in the 1985 preamble, the 1988 PRM, and two CMS Administrator Decisions confirm that the usage of an otherwise countable inpatient bed for a purpose other than inpatient services does not render the bed unavailable for purposes of the DSH bed count. As the Secretary herself explains, the original IME methodology was to count only available beds on the first day of the cost reporting period. Def.'s Mot., at 7-8. The 1985 rulemaking changed the methodology to require a hospital to count available bed days during the current cost reporting period divided by the number of days in the cost reporting period. *See* 42 C.F.R. §§ 412.106(a)(1)(i). The Secretary explained the reason for this change in the 1985 preamble:

> [s]ince a hospital's *bed size may increase or decrease, sometimes substantially, over the course of a cost reporting period*, we proposed to base the number of beds on the number of available bed days (excluding beds assigned to newborns, custodial beds, and beds in excluded units) during the current cost reporting period divided by the number of days in the cost reporting period.

50 Fed. Reg. at 35,679 (emphasis added). In her briefing, the Secretary points to this explanation as evidence that a hospital's bed size could fluctuate day-to-day and, thus, "available bed days" was intended to measure daily usage. Def.'s Mot., at 8-9. However, the 1988 PRM explicitly clarifies that "[t]he term 'available bed' as used for the purpose of counting beds is not intended

to capture the day-to-day fluctuations in patient rooms and wards being used.[10] Rather, the count

is intended to capture changes in the size of a facility as beds are added to or taken out of

service." PRM § 2405.3(G). The Court finds the language and import of the PRM and the

preamble clear—"day-to-day, or perhaps even hour-to-hour, change in the occupancy of these

beds does not reflect the overall size of the Plaintiff hospital[], which is what the bed count is

intended to capture." *Clark*, 314 F.3d at 248-49.

The fact that day-to-day fluctuations in usage do not derail the counting of a bed is

further confirmed by the 1988 PRM's instruction that "beds available at any time during the cost

reporting period are presumed to be available during the entire cost-reporting period." PRM

§ 2405.3(G). The Secretary correctly notes that this presumption applies only "[i]n the absence

of evidence to the contrary." Def.'s Reply, at 23 (quoting PRM § 2405.3(G)). But non-permanent

use of an inpatient bed for observation services is not the kind of evidence contemplated by the

regulation or the PRM. That unavailability contemplates more permanent or long-term structural

changes is reinforced by the fact that beds "in a completely or partially closed wing of the

facility" are still considered available if the hospital can "put the beds into use when they are

needed." PRM § 2405.3(G); *see also* 50 Fed. Reg. at 35,683 ("If some of the hospital's wings or

rooms on a floor are temporarily unoccupied, the beds in these areas are counted if they can

---

[10] The Secretary argues that the plainest meaning of "not intended to capture day to day fluctuations" in the 1988 PRM is that it applies to cost reporting periods beginning before October 1, 1984. Def.'s Mot., at 29. The Court has closely read the 1988 PRM and fails to find any textual support for the Secretary's argument. Moreover, as Plaintiff astutely notes, the Secretary's argument is illogical "because during those years, the regulation did not even capture changes in size of facility during a year." Pl.'s Reply, at 26. The Court also finds the PRM's non-fluctuation explanation consistent with the language in the 1985 preamble which states that a hospital's bed size "*may* increase or decrease … over the course of a cost reporting period." 50 Fed. Reg. at 35,679. As fluctuations in daily occupancy of an inpatient bed inevitably occur, this language strongly suggests that the Secretary was not focused on day-to-day fluctuations, but more permanent, structural changes to a facility.

immediately be opened and occupied."). Likewise, the CMS Administrator in *Pacific Hospital of Long Beach v. Aetna Life Insurance Company* found the fact that beds were assigned to a unit that was in use as office space or to a unit that was under construction was not evidence that these beds were not "available" under the bed count regulation because "beds temporarily withheld from service are still counted as available beds for the purpose of determining the Provider's IME adjustment if they can be immediately occupied." *Pac. Hosp. of Long Beach v. Aetna Life Ins. Co.*, Adm'r Dec. (Feb. 2, 1993), *reprinted in* Medicare & Medicaid Guide (CCH) ¶ 41,355 (2003 AR at 477, 481). Similarly, in *Santa Clara Valley Medical Center v. Blue Cross and Blue Shield Association*, the CMS Administrator found that evidence that inpatient beds were used as physician sleeping beds was not evidence that the beds were unavailable because the beds were otherwise "close to being set up" even though it would move the doctors out. *Santa Clara Valley Med. Ctr. v. BCBSA*, Adm'r Dec. (Mar. 28, 1997), *reprinted in* Medicare & Medicaid Guide (CCH) ¶ 45,230 (2003 AR at 489). In short, these examples illustrate that a bed is properly counted as an "available" bed under the bed count regulation if the bed can be put to use "when needed" even if it takes some time. Observation services typically last less than 24 hours and only in "rare and exceptional cases do reasonable and necessary outpatient services span more than 48 hours." Medicare Benefits Policy Manual, Chapter 6, § 20.6 (2003 AR at 396). The beds at issue here in which observation services were provided were otherwise certified, staffed, and ready for inpatient use. That such an inpatient bed in an acute care area of the hospital is occasionally used for observation services does not mean that it is "taken out of service" while it is providing those services as contemplated by the regulation or the PRM. As the Sixth Circuit found in *Clark* "[t]here is nothing in the language of the PRM that indicates that

a bed is 'unavailable' simply because it is not exclusively designated for acute inpatient care." *Clark*, 314 F.3d at 248.

The Secretary makes a final argument that Plaintiff did not have inpatient capacity of 103 beds because "on average" Plaintiff carried six outpatients in its 103 inpatient beds. Def.'s Reply, at 23. The Secretary is in effect arguing that due to the frequent usage of Plaintiff's inpatient beds for observation services throughout the cost report year, six beds should effectively be considered as permanently taken "out of service." Def.'s Reply, at 3. Based on the language of the regulation and the Secretary's contemporaneous statements outlined above, the Court finds the Secretary's argument misguided. All 103 of the Hospital's beds at issue were located in the acute care area of the hospital and certified, staffed, and ready for acute care inpatients. *See* PRM § 2405.3(G) ("To be considered an available bed, a bed must be permanently maintained for lodging in patients. It must be available for use and housed in patient rooms or wards (i.e. not in corridors or temporary beds)."). There is no evidence to the contrary. That, "on average," six of the beds had outpatients in them receiving short term observation services, which generally last less than 24 hours, does not mean the beds were not "available" for use under the governing regulation and interpretive rules as discussed above. Accordingly, the Court finds it was arbitrary and capricious for the CMS Administrator to conclude that "there are no facts contained within the record that support the Provider's claim that such beds could have been made available for inpatient use." AR at 15 (CMS Administrator Decision).

In sum, the Court finds that the Secretary's interpretation and application of the DSH bed regulation to Plaintiff's 2003 cost report conflicts with the plain language of the regulation, the Secretary's contemporaneous statements, and the Secretary's statements in the years following the promulgation of the DSH bed regulation.

### iii.   BCBSA Bulletin and Cost Report Worksheets

The Secretary also relies on several documents outside of the Code of Federal Regulations and the Federal Register as proof of the Secretary's purported "longstanding" policy of excluding bed days on which inpatient beds are used for non-inpatient services. Specifically, the Secretary cites to a 1988 Blue Cross Blue Shield Association ("BCBSA") Administrative Bulletin No. 1841, *see* Def.'s Mot., at 11-12, and several cost report worksheets and instructions from 1996 and 1999, *see* Def.'s Reply, at 11-15. However, neither the PRRB nor the Administrator relied on or even referenced these documents in rendering their decisions. *See NRDC v. EPA*, 755 F.3d 1010, 1021 (D.C. Cir. 2014) ("[A]n administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained.") (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943)). Moreover, these documents were not part of the Administrative Record that was before the agency when rendering its decision and that is now before this Court. The Administrative Procedure Act directs the Court to "review the whole record or those parts of it cited by a party." 5 U.S.C. § 706. This requires the Court to review "the full administrative record that was before the Secretary at the time he made his decision." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 420 (1971), *abrogated on other grounds by Califano v. Sanders,* 430 U.S. 99 (1977). Courts in this Circuit have "interpreted the 'whole record' to include all documents and materials that the agency directly or indirectly considered … [*and nothing] more nor less*." *Pac. Shores Subdivision, Cal. Water Dist. v. U.S. Army Corps of Eng'rs,* 448 F. Supp. 2d 1, 4 (D.D.C. 2006) (alteration in original, emphasis added, and citation omitted). Accordingly, the Court will not consider the BCBSA Bulletin nor the cost report worksheets and instructions in evaluating the Administrator's decision regarding the Hospital's 2003 cost report.

### iv.      1997 Memorandum

Finally, the Secretary relies on a February 27, 1997, Memorandum from the Acting

Deputy Director of the Bureau of Policy Development to all CMS regional offices which

explicitly addresses the exclusion of observation services provided in inpatient beds:

> If a hospital provides observation services in beds that are generally used to
> provide hospital inpatient services, the equivalent days that those beds are used
> for observation services should be excluded from the count of available bed days
> for purposes of the IME and DSH adjustments. If a patient in an observation bed
> is later admitted, then the equivalent days before the admission are also excluded.
> *Thus, all observation bed days are excluded from the available bed count.*

Def.'s Mot., at 14 (citing 2003 AR at 402-04 (emphasis added)). The Secretary argues that this

memorandum "merely restated what had been the Secretary's policy for over a decade." *Id.*

Plaintiff launches many arguments against the Secretary's reliance on the 1997 Memorandum,

but the Court need not address all of them because the Court agrees that the 1997 Memorandum

represents an interpretive rule to which little to no deference is warranted given "the facts and

circumstances surrounding [its] creation." *Oceana, Inc. v. Locke*, 831 F. Supp. 2d 95, 116-17

(D.D.C. 2011). Interpretive rules receive a level of deference "warranted by the facts and

circumstances surrounding their creation," *id.*, including "the degree of the agency's care, its

consistency, formality, and relative expertness," and "the persuasiveness of the agency's

position," *U.S. v. Mead Corp.*, 533 U.S. 218, 228 (2001). Here, the Memorandum was written by

a subordinate agency official and did not cite to any authority or provide any analysis or

reasoning for its observation bed days policy. Plaintiff contends that this subordinate agency

official did not have "delegated rulemaking authority," *see* Pl.'s Opp'n, at 22, and Defendant

does not contest this characterization in her reply briefs. In light of the fact that the policy

articulated in the Memorandum represented a departure from the plain language of the IME/DSH

regulation and the Secretary's contemporaneous statements, as discussed above, the lack of

supported reasoning for the policy reflects a lower degree of "agency[] care" and "formality." More importantly, the Memorandum was not published or otherwise "issued in a manner designed to place the public (e.g., providers) on notice of this change in policy because the distribution list for the memorandum was only internal." 2003 AR at 35 (PRRB Decision); *see also* 68 Fed. Reg. 27,154, 27,205 (May 19, 2003) (explaining the "memorandum was sent to all CMS Regional Offices (for distribution to fiscal intermediaries)").

Moreover, the fact that the Memorandum was not published in the Federal Register even though the Medicare Act requires publication in the Federal Register of "all manual instructions, interpretive rules, statements of policy, and guidelines of general applicability … " "not less frequently than every 3 months" further persuades the Court to give little, if any, weight to the Memorandum. 42 U.S.C. § 1395hh(c)(1). The Secretary contends that "even if the Secretary did not comply with this requirement"[11] Plaintiff bears the burden of proving that it was prejudiced by the failure. Def.'s Mot., at 31 (citing *Cent. Iowa Hosp. Corp. v. Sebelius*, 762 F. Supp. 2d 49, 56 (D.D.C. 2011) (rejecting § 1395hh(c) noncompliance argument where the plaintiff failed to show prejudice), *aff'd*, 466 Fed. Appx. 6 (D.C. Cir. 2012); *St. Luke's Hosp. v. Sebelius*, 662 F. Supp. 2d 99, 104 (D.D.C. 2009) (same), *aff'd*, 611 F.3d 900 (D.C. Cir. 2010)). The cases cited by Defendant focus on whether the plaintiff had notice of the agency's policy even though the policy was not published in the Federal Register as required. Defendant speculates that Plaintiff cannot show such prejudice (1) because there is "no evidence that fiscal intermediaries did not

---

[11] The Secretary appears unwilling to concede that it did not publish the 1997 Memorandum in the Federal Register as required. *See* Def.'s Mot., at 31 ("even if the Secretary did not comply with this requirement … "); Def.'s Reply, at 11 ("the Secretary's purported failure to list the February 27, 1997 Memorandum in the Federal Register … "). However, the Secretary does not present any argument or point to any evidence to suggest that the Department was in compliance with the publishing requirement or did not have to comply with the publishing requirement.

make the memorandum available," and (2) because the Secretary's position regarding

observation bed days was publicly reflected in the 1996 cost reporting worksheet and

instructions and in the Department's litigating position in the Sixth Circuit's 2002 *Clark* decision.

Plaintiff responds that "[t]he Hospital is prejudiced by the application of this unlisted, nonpublic

standard" and points to the fact that the PRRB itself found that the Memorandum "was not issued

in a manner designed to place the public (e.g. providers) on notice." Pl.'s Opp'n, at 32 (citing

2003 AR at 35).

The Court finds Defendant's speculation about Plaintiff's notice of the policy reflected in

the 1997 Memorandum unavailing. The fact that there may not be any "evidence that the fiscal

intermediaries did not make [the Memorandum] available" does not establish that Plaintiff was in

fact on notice, especially when the PRRB has found that the Memorandum was issued in a

manner that was not designed to place the public on notice. Furthermore, the Court finds it

unreasonable to impute to Plaintiff notice of the Secretary's policy based on the Sixth Circuit's

2002 explication of the Secretary's *litigation* position in *Clark*—a case involving different parties

in which the Sixth Circuit ultimately found that the Secretary's exclusion of observation bed days

from inpatient beds could not be squared with the DSH regulation or the Department's published

interpretive guidance. *See Clark*, 314 F.3d at 247. As for the 1996 cost report worksheets and

instructions, as the Court discussed *supra*, these documents were not part of the Administrative

Record and thus will not be considered by the Court. Accordingly, the Court finds that the

Secretary's failure to publish the 1997 Memorandum in the Federal Register renders the 1997

Memorandum an invalid interpretive rule entitled to little to no deference.

Finally, the Secretary contends that even if the Court were to find the 1997 Memorandum

to be an invalid interpretative rule, the Memorandum can be considered as evidence of the

consistency of the Secretary's policy regarding the exclusion of observation bed days. Def.'s

Mot., at 32. The Court agrees with Plaintiff that "[a] procedurally invalid document that was

issued by a subordinate agency official, cites nothing, was never published, and contradicts the

agency's primary interpretive guidance on the subject presents no probative evidence of the

'consistency' of the Secretary's policy." Pl.'s Opp'n, at 33. Accordingly, the Court will not give

any weight to the 1997 Memorandum.

### v.      Conclusion

The Court finds that the Secretary's 2003 decision to deduct observation bed days from

the Hospital's 103 licensed inpatient beds located in the Hospital's acute care area cannot be

reconciled with the plain language of the Secretary's regulation, the 1988 PRM, and the

Secretary's contemporaneous statements. As the regulation stood and was interpreted at the time

Plaintiff submitted its 2003 cost report, inpatient beds used for observation services but

otherwise available for inpatient use should have been considered available beds for purposes of

the DSH adjustment. Accordingly, the Court concludes that the Secretary's 2003 reimbursement

determination was arbitrary, capricious, and otherwise contrary to the law. The Court vacates the

final decision of the Secretary regarding Plaintiff's 2003 cost year and reinstates the decision of

the PRRB finding in favor of the Hospital. The Court remands to the agency for further

proceedings consistent with this Memorandum Opinion.

### B.  Cost Years 2004 and 2006

In deducting the number of observation bed days from the available bed days listed to

determine the amount of DSH payments for which Plaintiff was eligible for cost years 2004 and

2006, the Secretary applied the DSH bed count regulation as amended in 2003 and again in 2004.

The amendments to the regulation promulgated in 2003 indicate clearly the exclusion of bed

days associated with "beds otherwise countable under this section used for outpatient observation services." 68 Fed. Reg. at 45,470. The following year, in 2004, the agency promulgated a further change to the regulation indicating that the exclusion of observation services bed days "would not apply if a patient treated in an observation bed is ultimately admitted for acute inpatient care, in which case the beds and days would be included in those counts." 69 Fed. Reg. at 49,245. As amended in 2004, the bed regulation states:

> For purposes of this section, the number of beds in a hospital is determined by counting the number of available bed days during the cost reporting period and dividing that number by the number of days in the cost reporting period. *This count of available bed days excludes bed days associated with …. [b]eds otherwise countable under this section used for outpatient observation services,* skilled nursing swing-bed services, or ancillary labor/delivery services. *This exclusion would not apply if a patient treated in an observation bed is ultimately admitted for acute inpatient care, in which case the beds and days would be included in those counts.*

*Id.* (emphasis added). Plaintiff contends that it was arbitrary and capricious for the Secretary to apply the regulation as amended in 2003 and 2004 to deduct bed days from the Hospital's 2004 and 2006 cost reports because the regulation represents a policy change and "the Secretary neither acknowledged nor explained any coherent, good reason for the policy change." Pl.'s Mot., at 2. Plaintiff further argues that the new policy "defies all logic and reason, unreasonably altering a hospital's bed size for a cost year with temporary and fluctuating uses of the beds and treating similar situations differently with no coherent explanation for the agency's disparate treatment." *Id.* In addition, Plaintiff contends that the Secretary's new policy "generally equating bed size with the count of patient days, is inconsistent with the controlling statute because it equates two plainly different statutory terms, 'beds' and 'patient days,' that serve different statutory purposes." *Id.*

The Secretary responds that the Department's actions in promulgating the amended regulation and applying it to the Hospital were neither arbitrary nor capricious because "the

Secretary engaged in notice-and-comment, considered alternatives, and fully explained her reasoning" and because "the Secretary's policy is reasonable." Def.'s Mot., at 1-2. The Court has thoroughly reviewed the Secretary's explanations for the 2003 and 2004 rulemakings published in the Federal Register, *see* 68 Fed. Reg. at 27,154, 27,202-06, 45,415-19; 69 Fed. Reg. 45,415-20, and finds that the Secretary's promulgation of the new regulations and application of the regulations to the Hospital's 2004 and 2006 cost years were neither arbitrary nor capricious nor otherwise contrary to the law.

### i.     Reasoning for Departure from Prior Policy

Plaintiff contends that the Secretary's rule as amended in 2003, and again in 2004, "marks an unacknowledged and unexplained departure from the agency's prior regulation, policy and practice." Pl.'s Mot., at 28. Plaintiff points to several cases holding that when an agency changes course on a policy "it must 'provide reasoned explanation for its action,' which 'would ordinarily demand that it display awareness that it *is* changing position.' " *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1038 (D.C. Cir. 2012) (quoting *Fox*, 556 U.S. at 515); *see also Dillmon v. Nat'l Transp. Safety Board,* 588 F.3d 1058, 1089-90 (D.C. Cir. 2009) ("Reasoned decision making … necessarily requires the agency to acknowledge and provide an adequate explanation for its departure from established precedent."); *Northpoint Tech., Ltd. v. FCC*, 412 F.3d 145, 156 (D.C. Cir. 2005) ("A statutory interpretation … that results from an unexplained departure from prior [agency] policy and practice is not a reasonable one."). Plaintiff argues that the Secretary's insistence throughout the rulemaking that the amended regulation was a "clarification" of "longstanding policy," 68 Fed. Reg. at 45,419, by itself renders the rulemaking arbitrary and capricious because it fails to meet this "core requirement" that the Secretary acknowledge it is changing its position. Pl.'s Mot., at 29.

The Court disagrees that the 2003 and 2004 rulemakings were arbitrary and capricious simply because the Secretary did not concede that the amended rule was a "change" from prior policy. Although the Secretary states that the new rule is a "clarification" of its pre-existing policy, the Secretary directly acknowledges that "some hospitals have contested our policy excluding … observation beds and patient days under existing §§ 412.105(b) and 412.106(a)(1)(ii)" and "some courts have applied our current rules in a manner that is inconsistent with our current policy and that would result in inconsistent treatment of beds, patient days, and costs." 68 Fed. Reg. at 27,202. The Secretary specifically engages with the holding in *Clark Regional* and explains that, while the Sixth Circuit found the "listing of beds to be excluded from the count restricts the class of excluded beds only to those specifically listed," the "list of the types of beds excluded from the count under existing § 412.105(b) was never intended to be an exhaustive list." *Id.* at 27,205. The Secretary concludes that the regulation is being amended "[i]n order to avoid any potential future misunderstandings about our policies regarding the exclusion of observation … bed days." *Id.* at 27,206.

The Court finds that the Secretary's acknowledgement of prior alternative policy interpretations meets the "core requirement" of rulemaking, especially in light of the fact that the Secretary goes on to fully explain her reasons for the policy that she sought to clarify through the rulemaking. When an agency changes its policy "[i]t suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better … ." *Fox*, 556 U.S. at 515. Notably, the Secretary explains that "[t]he policies to exclude observation bed days and swing-bed days stem from the fact that these bed days are not payable under the IPPS" and "are based on the principle of counting beds in the same manner as the patient days and costs are treated." 68 Fed. Reg. at 27,204-05. The Secretary further reasoned

32

that "[w]hen the application of IPPS payment policy is dependent on a determination of a hospital's number of beds, it seems reasonable to base that determination on the portion of the hospital that generates the costs that relate to those IPPS payments." 68 Fed. Reg. at 45,419. Although the new regulations may not represent the only way to measure bed size, the Court finds that the Secretary has provided a reasoned explanation for its action and that the amended bed size measurement does not contradict the statute.

### ii.    Purported Internal Inconsistencies

Plaintiff further argues that the Secretary's 2003 and 2004 rulemakings were arbitrary and capricious because "the Secretary has utterly failed to articulate any coherent explanation for the internal inconsistencies in the agency's position." Pl.'s Mot., at 30. Specifically, Plaintiff claims that the Secretary failed to explain why observation bed days are treated differently than other uses of hospital facilities that Plaintiff argues are similarly situated. It is true that, "[a]s a general matter, an agency cannot treat similarly situated entities differently unless it 'support[s] th[e] disparate treatment with a reasoned explanation and substantial evidence in the record.'" *Lilliputian Sys., Inc. v. Pipeline & Hazardous Materials Safety Admin.*, 741 F.3d 1309, 1313 (D.C. Cir. 2014) (quoting *Burlington N. & Santa Fe Ry. Co. v. Surface Transp. Bd.,* 403 F.3d 771, 777 (D.C. Cir. 2005)) (alterations in the original). However, the Court concludes that the purported inconsistencies do not pertain to activities that are, in fact, similarly situated and that, insofar as Plaintiff identifies disparate treatment among similarly situated activities, the agency has adequately explained the reasons for the disparate treatment. The Court addresses, in turn, the supposed inconsistencies that Plaintiff identifies.

First, Plaintiff looks to several categories of activities that *are not* excluded from "available bed beds," even though those activities are *not included* in patient days. The Hospital

contrasts these activities with observational services, which *are* excluded from bed days pursuant

to the 2003 rulemaking (and are also excluded pursuant to the 2004 rulemaking, unless the

patients are subsequently admitted as inpatients). Plaintiff points to the treatment of empty beds,

spaces used for sleeping doctors and office storage, and experimental procedures as evidence of

inconsistencies.

The Court begins with the treatment of empty beds because, notwithstanding Plaintiff's

arguments to the contrary, they are self-evidently different than beds occupied for observational

services. In contrast to beds that are used for observational services, beds that are empty are not

excluded from "available bed days." This treatment is wholly reasonable because an unused

bed—or empty bed—is by its very nature available for use. By contrast, as the Secretary

emphasizes, a bed *used* for observational services—which do not qualify for payment under

Medicare Part A, with limited exceptions—is by its nature not available for use. *See* Def.'s Mot.,

at 37. Accordingly, the agency is not applying disparate treatment to similar activities because

empty beds and beds used for observational services are simply different.

Next, the Court turns to beds used temporarily for ancillary, non-patient uses, such as

doctors sleeping or office space, as well as space under renovation. The Court need not delve

into the question of whether the decisions on which Plaintiff relies are applicable only in the

context of completely or partially closed wings, *see* PRM § 2405.3(G); 2003 AR at 284, because

these uses are also fundamentally different from observational services. Observational services

are compensable under Medicare Part B and not under Medicare Part A—subject to limited

exceptions—and therefore it is reasonable not to count facilities used for Part B activities in

assessing the size of a facilities for the purposes of a DSH adjustment under Part A. By contrast,

all of the activities identified by Plaintiffs, from the time a doctor spent sleeping to minor

renovations, are not compensable patient-focused activities; instead, they are activities that are

ancillary to the patient-focused activities that are compensable under Part A. As such, they are

fundamentally different from the observational services whose treatment is challenged here. The

agency adequately explained its treatment of observational services, *see* 68 Fed. Reg. at 45,415-

21; 69 Fed. Reg. at 49,096-97, in the context of the broader DSH scheme. The agency had no

further obligation to *sua sponte* explain differences between the treatment of these ancillary

activities and the treatment of observational services because they are not, in fact, similarly

situated.

So, too, with experimental procedures. Experimental procedures are procedures that are

not compensable under Medicare Part A. However, they are the type of procedures that are

similar to those that are compensable under Part A and, therefore, are appropriate to conduct in

the acute care facilities used for Part A activities, the type of facilities that are quantified in

determining the number of available bed days. As the agency explained, "[t]he expectation is that

a patient [receiving an experimental treatment] located in an acute care unit or ward of the

hospital is receiving a level of care that is consistent with what would be payable under the

IPPS." 68 Fed. Reg. at 45,417. This understanding in stark contrast to observational services,

which do not need to occur in inpatient beds that accommodate activities compensable under Part

A. *See* 69 Fed. Reg. at 49,096 ("Observation services may be provided in a distinct outpatient

observation bed area, (which is not a routine inpatient acute care unit or ward for which costs are

included for purposes of the IPPS)"). Because experimental procedures are the type of

procedures that would be performed in a Part A-qualified bed, but observational services are not,

the Court concludes that they are not similarly situated. The agency adequately explained its

treatment of beds used for experimental procedures, *see id.,* and it did not have any further

obligation to explain any discrepancies between the treatment of those activities and the treatment of beds used for observational services.

While Plaintiffs identify several categories of activities that *are not* excluded from available bed days even though they *are* excluded from patient days—in contrast to the treatment of observational services, which are excluded from both—the agency has adequately explained its treatment of these activities. The Court concludes that none of the identified activities are, in fact, similarly situated to observational services such that additional explanation of differences in treatment among these types of activities is necessary. The Court also concludes that, to the extent to which the identified activities are similar to observational services, the agency has explained those differences adequately.

Second, Plaintiff argues that the treatment of nursery beds is inconsistent with the treatment of beds used for observational services. Plaintiff's argument here is different from the argument pertaining to the activities discussed immediately above, because the treatment of nursery beds is different from the treatment of those activities. Specifically, for the purposes of calculating the Medicaid fraction of the disproportionate patient percentage—used to calculate the level of the DSH adjustment, as explained above—healthy newborn patient days are *included* in the count of Medicaid patient days and the count of total patient days. 68 Fed. Reg. at 45,417. However, these days are *not included* in the count of bed days because the healthy newborn nursery as a whole is excluded from that calculation. *See* 50 Fed. Reg. at 45,811. Because of this discrepancy, Plaintiff argues that the Secretary cannot logically argue that observational services should be excluded from bed days in order to facilitate consistency with the calculation of patient days. However, the Secretary adequately explained the treatment of the newborn nursery in the 2003 rulemaking. *See* 68 Fed. Reg. at 45,417 ("Medicare does not generally cover services for

infants. However, Medicaid does offer extensive coverage to infants, and nursery costs would be directly included in calculating Medicaid hospital inpatient care costs."). Once again, the Court concludes that the differences between the treatment of the healthy newborn nursery and of observational services are justified by differences in those activities. Specifically, as explained above, the DSH provisions of the Medicare statute explicitly requires the calculation of a Medicaid fraction—the proportion of the total patient days attributable to Medicaid and not compensable under Medicare Part A—in order to determine the level of the DSH adjustment. *See Allina Health Servs.*, 746 F.3d at 1105. In other words, the statute requires the assessment of *Medicaid* funded activities in calculating patient days for the purposes of establishing the DSH adjustment for *Medicare* Part A payments. The Court concludes that, given that the provisions of the Medicare act establishing the formula for calculating the DSH adjustment require assessment of Medicaid activities, the healthy newborn nursery is not similarly situated to observational services. Accordingly, the Court concludes that the agency has adequately explained the treatment of both observational services and the healthy newborn nursery, and the Court concludes that the agency had no obligation to provide any further explanation of the differences between the treatment of the healthy newborn nursery and the treatment of observational services for the purposes of calculating the DSH adjustment.

Third, Plaintiff argues that the Secretary's exclusion of observation bed days "unreasonably conflates" "patient days" and "bed days," two statutorily-distinct terms and therefore is inconsistent with the plain language and intent of the DSH statute. Pl.'s Mot., at 36. Plaintiff's argument is unavailing. The Secretary does not equate—or conflate—"patient days" and "bed days." As explained above, in discussing the parties' arguments, "bed days" and "patients days" do not always encompass the same activities. However, just because the terms

are used for different aspects of the calculation of the DSH adjustment and just because different activities are assessed differently with respect to these two categories does not mean that it is unreasonable for the agency to attempt, where possible, to interpret the terms so that they are consistent—where it is possible and where it is consistent with the overall statutory scheme. In the context of the complex statutory scheme governing Medicare, with numerous data tracking and reporting requirements, it is not unreasonable for the agency to implement the scheme such that two related, but distinct terms—"patient days" and "bed days"—are interpreted similarly where possible. The agency has explained why it has done so with respect to observational services. *See* 68 Fed. Reg. at 45,415-21; 69 Fed. Reg. at 49,096-97. The Court concludes that the explanation is adequate and that the decision to treat observational services similarly for the purposes of calculating bed days and patient days is reasonable.

As a final matter, the Court turns to differences between the 2003 rulemaking and the 2004 rulemaking. As a reminder, in 2003, the agency promulgated a rule that clarified the previous policy and made it clear that observational services were excluded from the calculation of available bed days. In that rulemaking, the agency considered a change regarding observation bed days of patients who are ultimately admitted as inpatients. However, in promulgating the final 2003 rule, the agency stated that it was "still in the process of reviewing comments and defer[red] action until a later rule with respect to this issue." 68 Fed. Reg. at 45,419. Accordingly, the rule promulgated that year excluded observational services even for patients that were ultimately admitted as inpatients. *See id.* After further consideration of the issue, in the final rule promulgated in 2004, the agency ultimately decided that observational services time would be included in both bed days and patient days if the patient is ultimately admitted. *See* 69 Fed. Reg. at 49,097. Neither of these decisions was arbitrary or capricious. The agency

reasonably concluded, in 2003, that it was necessary to give further consideration to changes to what it understood as the existing policy, particularly because those changes would necessarily involve changes in the tracking and reporting of data pertaining to observational services. *See id.* (describing changes to data tracking and reporting). Similarly, the 2004 rulemaking, which introduced changes that brought the calculation of bed days and patient days into closer alignment with each other and with other portions of the Medicare funding scheme, was a reasonable policy change and was adequately explained by the agency. *See id.* at 49,096-97.

In sum, the Court has considered all of the parties' arguments, and the Court concludes that the changes made in the 2003 and 2004 rulemakings with respect to observational services are adequately explained, reasonable, and not inconsistent with the statute.

## IV.   CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiff's Motion for Summary Judgment and DENIES Defendant's Cross-Motion for Summary Judgment pertaining to cost year 2003 (Case No. 14-cv-159). The Court VACATES the decision of the Secretary challenged in that action, REINSTATES the underlying decision of the Provider Reimbursement Review Board, and REMANDS that action to the agency for further proceedings consistent with this Memorandum Opinion. The Court DENIES Plaintiff's Motion for Summary Judgment and GRANTS Defendant's Cross-Motion for Summary Judgment pertaining to cost years 2004 and 2006 (Case No. 13-cv-1775).

An appropriate Order accompanies this Memorandum Opinion.

Dated: September 16, 2015

                                       /s/
                                         COLLEEN KOLLAR-KOTELLY
                                         United States District Judge